Judge Uitdekwood,
not concurring with the Chief Justice and Judge Nicholas, in the foregoing Opinion and Decision, presented his views of the case, and reasons for dissenting, as follows :—
It is thought that the contract entered into by the parties to this suit and others, constituting the society of people denominated Shakers, and located at Pleasant Hill, in Mercer county, is.the creation of a charity, within the meaning of a British statute, yet in force, passed in the forty third year of the reign of Queen Elizabeth. I am of a different opinion; and as the question is one of importance, I deem it proper to state the grounds upon which I dissent from the the conclusions to which the other members of the court have arrived.
It is necessary, in the first place, to ascertain the design and object of that statute. These are set out in the case of the Baptist Association vs. Hart's Executors, 4 Wheaton, 37, and are, moreover, manifest from the face of the statute. It appears, as well from the stab- *186 u[e as from the opinion of the supreme court, that t/&< nevolent persons had theretofore given lands, money See» for the relief of aged, impotent and poor people; for maintenance of schools of learning; for repair of bridges See. See.; which lands Sec. “ have not been employed according to the charitable intent of the givers, by reason of frauds, breaches of trust and negligence, in those' that should pay, deliver and employ the same and, therefore, the statute provides a remedy for these frauds, breaches of trust, and negligences. The Lord Chancellor empowers, in virtue of the statute, commissioners to enquire into the facts touching the donation of lands &c. for charitable purposes, and by his decrees, enforces the application of the funds according to the intention of the donor. He brings trustees to an account, and compels them to apply the funds, which, prior to the statute, they might have withheld. I admit that a colossal fabric of chancery jurisdiction and power has been reared upon this statute, but I am not for enlarging its dimensions.
Two things are necessary to constitute a charity according to the statute ; first, that there should be a gift or conveyance of land or money or other thing ; and, second, that the gift or conveyance should be for the purpose of accomplishing some one or more of the benevolent objects mentioned in the statute, or some object so akin to them as to be embraced by its spirit.
In regard to the gift or conveyance, it must pass the title to the thing given or conveyed, so that the donor can no longer control the estate. As long as the donor keeps the control and the possession, he could apply the estate according to his benevolent designs. It would be absurd to suppose, that the statute was passed to afford a remedy, to enforce a charity, against the donor himself. It was “ frauds, breaches of trust and negligence” in those who received the funds from the donor, that produced the statute. The donation must have •taken effect, so far as to vest the title in a trustee, before there can be any pretence to say, that the donor has established, or created a charity. The statute does ¡not say, that a promise to give land or money for char *187 fiable objects, shall be enforced against the promisor. It provides only for applying a donation actually made, according to the express intent of the donor, if the specified object be legal ; and if not, then arbitrary construction and the chancellor’s power have seized the fund, and applied it to such purposes as the chancellor deemed proper, rather than let it go, where the donor was dead, to the heir at law or next of kin.
In regard to the object of the gift, it must be one of those enumerated in th^ statute, or so nearly allied as to-be embraced by the spirit of the act. Thus the- erection of a mill and the conveyance of it to trustees, to-the intent that the inhabitants might have the convenience of grinding there, is not a charity within the statute. 2 Vern. 387. Ba. Abr. Charitable Uses, lct. C.
Testing the covenant of the Shakers by the foregoing rules, it is not a charity, according to my understanding, within the meaning of the 43d of Elizabeth. The funds of the Shakers are not given for any one of the objects mentioned in the statute, nor for any kindred object. If the funds are consecrated to the promotion of any charity contemplated by the statute, it is that (as it may be inferred from the opinion delivered,) which relates to the relief and maintenance of aged, impotent and poor people j “ for” (says the opinion,) “ persons of that class may become members, and derive the full benefit of the institution. There is nothing in its ordinances to exclude them.” True, such may become members. I find no ordinance to exclude them ; but I find nothing which' imperatively requires their admission. The covenant does not point out the inode of admission, nor does it provide for the organization of any tribunal to decide on the application for membership. It is clear to my mind, that the covenant does not allow all aged, impotent and poor people, who may choose, to quarter on the estates of the Shakers, and to claim the benefit of membership, as of the “church relationnor can I find a license for any one poor man to do this. It is, therefore, optional with the managers or trustees of the society, whether they will appropriate any part of the funds in their hands for the relief of *188 the poor. Now, the very idea of a charity founded on the 43d of Elizabeth, is, that it is compulsive, and not optional, on the part of the.trustees ; and the ground for interference by the chancellor is, to compel a delinquent trustee to execute the trust.
There is nothing to shew, that the members of the “church relation”..are objects of charity, or that they stand in need of donations, for their maintenance as poor people. The contrary is fairl}' deducible from the covenant. According to the third article of the cove-. nant, no one can become a member, unless he be of lawful age. Those who are free from debt are allowed to “bring in, and devote, as apart of the joint interest of the church, all such property as they justly hold.” Whether insolvency would be a valid objection to a candidate, for membership, is left for inference ; but conceding that it is no objection, and that a person may become a member without contributing any property to the joint funds or estates, as soon as he unites himself to the society, it is a part of his covenant duty “ to support and maintain the joint interest of the church according to his ability.” His labors, thereafter, are to be devoted to the increase of. the property of the society. Such a member, who is capable of earning a support, is no object of charity, within the meaning of the statute. It does not appear that any one of the covenant members no\v is, or was, at the time of signing the covenant, incapable of supporting himself by his labor. According to the third article, “the joint interest of the church, formed and established by the free will offerings of the members, shall be held and possessed by the whole body, jointly, as their natural and religious right; that is, all and every individual of, or belonging to, the church, shall enjoy equal rights and privileges in the use of all things pertaining to the church, according to their order, and as every one has need, without any difference being made on account of what any one brought in.” The evidence shews that the estates held by the society are large, and valuable. Here, then, wé see an association of individuals of full age, capable of supporting themselves by their own labor, bringing to *189 gether their separate property, and throwing it into a joint stock, constituting a rich fund, held by the whole body jointly, and to be used by them as they severally stand in heed, and bound to increase and keép up the fund by their labors ; and this association is made' the establishment of a charity for the benefit of poor people! I cannot perceive, in the 43d of Elizabeth, any foundation for such a conclusion.
The estates Of the Shakers are held exclusively for the use of the covenant members. The trustees are not bound to appropriate a dollar to feed or clothe any one, unless he be a covenant member, with the exception herein after mentioned. . There is a stipulation in the fifth article to this effect".— “ The trustees, in union with the body, may make presents and bestow deeds of charity upon such as they consider real objects, that arc without.” This provision is Hot imperative. Its insertion, shewing that deeds of charity towards others, were in the contemplation of the parties, indicates strongly to my mind, that they did not regard themselves as objects of charity in consequence'of their poverty. This consideration, taken in connection with the wealth which the society is shewn to possess, effectually discountenances the idea that the.object of the Shaker covenant was' to create a charity for' the benefit of poor people, within the purview of the statute of the 43d of Elizabeth.
The exception alluded to, is in the case of a person who joins what is called the “family relation.” A schedule is taken of the goods and chattels of the- person so joining, and if he chooses to withdraw thereafter, the society pay him in kind the value of the property mentioned in the schedule. The person thus joining a family of Shakers is entitled to a support during his continuance in the family, and is bound to contribute his labor, and the use of the propérty mentioned in the schedule.
I cannot perceive any object which can sustain the covenant of the Shakers as a charity'under the 43d of Elizabeth, (and no other has been suggested,) unless it be that of providing for the destitute and helpless.— *190 No such object is avowed ; their estates are consecrated, jo no such purpose ; on the contrary, they are expressly held for the-use of the covenant members, as they severally have need,notwithstanding they may be every way capable of supporting themselves, and not depend-ant. on the charitable fund. If I am correct in this view of the subject, there is no charity created for wa'nt of s'uoh an object as the statute sanctions. It should be remembered, that the covenant does not give funds or estate's for charitable objects without specification. — ■ Were such its operation, it might be contended that the chancellor might lay hold of the funds, and apply it to a particular object of charity of his. own designation. The covenant appropriates the property to specified purposes ; and the question is, whether these purposes are embraced by the statute ? If they are, I see nothing to prevent two or more men from consecrating their property and the earnings of their industry, by an association similar to that of the Shakers, leaving out its religious and antinuptial character, to the support of themselves, their wives and their children and their children’s children, through all time to come, exempt from the claims of creditors. The religion which mingles in the covenant of the Shakers can give it no additional weight as a charity. If it can, the heads of families, associating as I have supposed, might bring their peculiar religious tenets into their articles of association. Our judicial tribunals cannot take cognisance of a man’s religion, and determine' who possesses the most orthodox creed. The faith of A is just as good a consideration in Jaw as the faith of B, and no better. A Covenant to provide, by such an association-as is supposed, for women and children, would at least present as strong claims to tlie consideration of a chancellor, for enforcement as a charity, as the covenant of the Shakers in the present" case. I do not know the terms upon which the Harmonists and Mormonites associate •; but I see no reason why thejr associations may not be charities under the 43d of Elizabeth, if the association of the 'Shakers be a charity under that statute.
*191 I not only think that the covenant in question creates no charity, because of the absence of a legitimate object, such as the statute tolerates ; but I am of opinion that there is no gift, no donation, no divestiture of title, and placing it in trustees, for any charitable purpose whatever. The third article of tiie covenant, already quoted, after stating how the joint interest of the church is to be formed, expressly declares, that the property “shall be held and possessed by the u-holc body jointly, as their natural and religious right.” The addi-iion of the words “ natural and religious right” do not give greater force to the previous part of the sentence. It means that the members of the church or society of Shakers shall hold, as joint tenants, all the property and funds contributed by them severally. Although they have not expressed it in terms, yet I think it may be collected from the whole covenant, that they likewise intended to abide by the repealed doctrine of the jus accrescendi; and when a member died, it was probably the design of the covenant, that his interest should pass to the survivors. There is no provision expressly cutting off heirs and distributees.
The fifth article of the covenant makes it the duty of the trustees to take charge of the property and estate dedicated and given up, “ to the joint interest of the church ;” and provides that it shall be “ at the disposal of the trustee and agentship of the church in a continual line of succession.” Now I think it is clear, that the third article vests the title of the property in the whole of the members jointly. The fifth article does not divest, the members of their title, but merely authorizes the trustees or agents appointed by the second article, to bargain and sell, and dispose of the property, given up “to the joint interest of the church,” (that is, vested in all the members,) “ for the mutual benefit of the church, and in behalf of the whole body.” In ibis view, the trustees or agents of the society are not vested with the legal title, but a power merely is conferrd upon them, under which they may lawfully sell any part of the property. It became necessary for such a body. *192 in consequence of their numbers, regarding the objects of.their association, to transact the business of selling an<l buying through the instrumentality of a few agents. The fifth article, while it confers th'e authority to sell, not yest t|ie The title is vested in the whole body, by the third article.
The sixth article contemplates future acquisitions, and provides that all deeds &c. u which may hereafter be given to the trustees or agents of the society, for and in behalf of the joint body or church, express reference shall be had to the covenant.” I do not consider it very important to enquire into the proper mode of drafting a deed or conveyance, under the sixth article, so as to secure to the “joint body or church” the full benefit of the estate purchased. For, if it be conceded that the legal title would abide in the trustees, there can be no question that the deed should be so drawn as' to secure the use of the estate to all the members of the society, in conformity with the provisions of the coveenant. The requirement to make express reference to the covenant, was intended to secure this object. It should, at least, be such a deed, .as under the twelfth sec^ tion of the act of 1796 concerning conveyances, would transfer the’possession to those entitled to the use. Now, an estate so held, is for many purposes a legal estate. So far as it relates to the enjoyment of such an estate, it is as valuable (and as vendible too,) as a legal estate can be. Whether, therefore, the whole of the estates have been purchased under the sixth, or made up by contributions, (so far as relates to the personalty at least) according to the third article, can make no difference. Be it the one way, or the other, I contend that there is no gift or donation for charitable purposes within'the meaning of the 43d of Elizabeth.
The gifts contemplated by that statute, are such only as are placed, when made, beyond the control of the donor. Now, every article of the Shaker covenant shews, that the joint estates of the members continue subject to their control, notwithstanding the supposed donation for charitable purposes. The members appoint agents to manage, to sell, to buy. If these agents *193 Vacate their appointments, by death, or otherwise, the members of the society have an unquestionable right to appoint others in their place. These agents are responsible to the members for their conduct; and by the sixth article, are bound to keep books, in which the public affairs of the society are to be registered. Every member has a right to inspect these books, so that he may be informed of the conduct of the agents. — ■ The agents, in union with the body, (that is, provied a majority of the members consent,) may make presents &c. Here is a positive stipulation, which allows the agents of the society, acting in union with its members, to give away every cent’s worth of property own-, od by the whole jointly. What would become of the charity established for the benefit of the Shakers, in ease they should think proper to give away all their funds to needy Christians of other denominations, or to infidels ? Would they, as trustees of the fund, thereby be guilty of such fraud as would allow the chancellor to interpose and arrest them, for doing a thing which is expressly provided for ? But suppose, instead of giving away the property, the members of the society should cease those industrious, economical habits, for which, greatly to their praise, they are celebrated, and should consume the whole, under that provision of the covenant, which authorizes them to use it as they severally need — has the chancellor a right to interpose and arrest them, upon the ground that they are devastating the funds of a charity ?
Suppose further, that the members of the society were unanimously to agree to terminate their covenant,' and to divide out the estates in severalty — has the chancellor any power to prevent their doing it ? If the cove-nant has created a charity under the 43d of Elizabeth, and the members of the Shaker society are the recipients merely of its benefits, the chancellor would and ought to interfere. But if the covenant has retained to the members absolute dominion over the property of the society, then the members are not amenable to the chancellor, and they may destroy the foundation of the * *194 whole superstructure, if they please. I cannot bring’ my inind to doubt, as to the power of the members, to abolish or to amend their covenant and dispose of their estates, and funds as they please. They have made no strpufation they not. is the creation of their volition as free agents. They have never passed their property out of their own hands. They have provided expressly for the control of it in several important particulars, by limiting the power of their agents; and by securing the accountability and appointment of trustees and agents, they have effectually reserved power in their own hands to direct and control the entire disposition of the whole. There is no law abridging their right to change-or modify their contract, and so long as their capabilities to make a contract remain, they can annul or remodel a contract already made, if the Shakers have ever made a gift for a charity, to whom was the gift made ? To themselves, is the only ■answer which can be given. I deny that a main can give his estate to himself, and consecrate it thereby as a charity. He cannot contract with himself. 1 deny that he can establish a charity by conveying his estate to a trustee, with a covenant in the deed that the trustee shall hold for the use of the grantor. This is the case of an individual. An association of individuals cannot, by their union, alter the rules applicable to their conduct, and give a different aspect to a joint act, from that in which it would be viewed were it the performance of a single individual.
The opinion delivered, not only regards the property •carried into the joint stock as consecrated to the charity, but it takes in all the earnings of the members during their membership. If this may be done, why not pursue the earnings of a seceder, because he has once been a member, and appropriate these likewise to charitable purposes, under the idea that there is an entire devotion of all that a member has at the time he signs the covenant, or which he may thereafter obtain, to the objects of the society ? The covenant expressly “ requires a devotion to this extent.”
*195 ít is said in the opinion delivered, that “it cannot-be an objection to the designation of funds or property for charitable purposes, that the founder secures to himself, with the rest of the community, a right of partaking the benefits of the charity.” I admit, that the participation of the founder in the benefits of a public charity, is no argument to prove the efficacy or invalidity of a charitable donation in many cases.. Thus, if I -give-money to a trustee, to build a cluirch, for the use of presbyterians, baptists, or methodists, it is no objection to the charity that I myself as a member of the society for which it may be built) occupy a seat and attend public worship in it. So likewise if I give money to-build or repair a bridge, it is no objection to the charity that I myself pass over it, in common with the rest of the community. But if I give money to a trustee, to lay it out in the purchase of estates for the use of myself, wife and children, as we “severally need” during life, and then to “remain forever inviolably under the care and oversight” of trustees, for the use of my lineal descendants, as generation may succeed generation, to the end of time, I deny that it would be a parallel case to the donation of money to build a church, or a bridge, or to accomplish any other charitable object, within the meaning of the 43d of Elizabeth. No name which I might give the transaction by which I would thus entail estates upon myself and descendants, could constitute it a charity; and yet, this case, in principle, is precisely the case of the Shakers, with this difference, that by my arrangement, I have excluded all persons from participating in the use of the estates, unless they come in by a rule of blood, which I require shall be observed ; and in their case, they have excluded all who do not come, in virtue of a peculiar religious faith. Both cases,, however, agree in this, that it is an appropriation, of money essentially not public, but private and selfish, where a provision for one’s self during life, (and that is as long as we can enjoy property,) is the first object' which strikes the attention. I hold such an object utterly incompatible with the charity recognised by the *196 statute. Truly, charity begins at home, if such tilings are charities.
If the covenant does not create a charity under the 43d of Elizabeth, what does it accomplish ? I think jts scope and design perfectly manifest. The preamble to the covenant explains their object, and furnishes the rule by which the covenant itself is to be construed. It appears from the preamble, that the signers of the covenant believe, that the gathering together of the disciples of Jésus Christ, about the day of Penticost, and holding property jointly or in common, “ was only to serve as an example or .shadow of the everlasting union of the saints, when Christ should appear the second time ;” that Christ has actually appeared the second time in the world, of which fact, there is a new testimony or revelation from God, first made in England, and thence “ transplanted” to America ; that “ when the work of God began, in these last days, it evidenced itself to be the very work which God had promised* in gathering souls together and uniting them together in one interest, in things both temporal and spiritual that it is ?{'their duty and privilege, according to the holy scriptures and the present call of God, and the civil and religious rights secured to them, to obey their faith in all things; and moreover, it being.their faith, that the union and relation of the church of God in one joint interest, is a situation'the most acceptable to God and productive of the greatest good of any state or situation attainable on earth,” they, therefore, agree “to • unite in one body as a religious community, to be constituted, built up, and established upon the principles and rules of the church of Christ aforesaid that, in the language of the preamble, “ as God, according to his promise, has begun to give his people one heart and one way, that they may serve him forever, we do therefore expressly agree to and with each other, that the order of God may be known in the church, we will observe and keep, as delivered to us, with all and singular the rules, manners and ¿ustoms of the church, in relation to union, communion and fellowship, the rights, duties and privileges of the members, as also the offi *197 tiers of trust and care in the disposal- and management of the joint interest of the church, according to the following articles of covenant.” Then follow the seven articles of the covenant. It appears from the preamble, that the marriage relation is believed to be inconsistent with God’s will, and a mode is pointed out for dissolving the tie, which binds husband and wife,, in conformity with their ideas of religious duty. It also appears from the preamble, that there are two orders in the society of Shakers; first, the family order or relation,— the consequences resulting from which have already been briefly stated ; and second, the church relation or order. Those who sign the covenánt thereby become members of the church relation. Those who enter the church are required to “ settle it in their hearts, to make a full sacrifice to God, once for ail: as no ground is, or ever can be, left for any recantation.” The members of the church are to “ dedícale and devote themselves and all they possess to the service of God forever, according to the faith and invariable practice of the church.”
The foregoing is a brief outline of the creed ; the articles of the covenant are its fruit. The following will give an idea’how the spiritual and temporal affairs of the society are in fact conducted. I shalj not stop to enquire, whether in strict conformity with the articles of covenant or not. The preamble shews, that the “ present testimony of Christ’s second appearing,” was received “ through the medium and ministration of the general church in the eastern states, whose centre of union is the particular church of New Lebanon, in the township of Lebanan, county of Columbia, and state of New York ; from which place, the, messengers of gospel were sent.” The depositions prove, that, in the government of the society, the ministry are first and highest in power and authority — their appointment is by the mother church at New Lebanon, and vacancies are filled from the same source. Four persons constitute a full ministry, two of each .sex — a less number can act. The ministry appoint the elders, and the min-" istry and elders appoint the deacons and trustees. “The *198 officers of the society, within their respective, jurisdictions, are the sole judges of disorderly, disobedient and refractor}’conduct, and of departures from the estabiished rules and usages of the society ; and are authorized to apply such correction as in their judgment will effect the reformation of the offender, subject to the restrictions of the covenant.” This, is an extract from a deposition, and not from any part of the covenant.
The question recurs, what results from the creed, the covenant and the official machinery ? Nothing to my mind, but a general partnership for an unlimited time. The members, believing.’their duty towards God requires them to. break up those relations of life which they deem carnal, and to live together as brothers and sisters in Christ,, for their spiritual edification, have thrown all their property into joint stock, in which each is to have the same interest with every other, and they are, by their industry, to preserve and increase the fund and enjoy it so long as they live, and then it is to pass to the survivors, being members of the society, without ever terminating the institution. That, in my opinion', is the essence of the whole scheme: So long as its members choose to abide by it, I have no doubt it is competent for them to do so. But the opinion delivered puts it out of the power of the whole, or any one member, to bring about a partition of the joint estates, by declaring that these estates are consecrated to charitable purposes ; and the opinion only gives a use to.a member as long as he continues in the society, and of course terminates the use in respect to any one member, just as soon as he voluntarily abandons, or is ex-polled from the society. /
Í cannot consent that a voluntary abandonment, or expulsion from the society, terminates the interest of a member in the joint estate. There is no express provision in the covenant which imposes a forfeiture in case of abandonment or expulsion. If such a consequence can be collected from the covenant, it must be found in the stipulations of the seventh article, by which all the members agree never to “ bring any charge of debt, or damage, or hold any demand, whether against the *199 church or community, or any member thereof, on account of either property or services given, rendered or consecrated to the aforesaid sacred and charitable uses.” The provision is hot limited in its operation to those who leave the society. Taken literally it embraces those who continue in it-, as well as those who depart. It cannot possibly be construed to mean, that those who remain members shall hold no demand against or upon the property of the society, which, by the third article of the covenant, is expressly charged with their support. Such a construction would be altogether repugnant to and inconsistent with the plain and obvious temporal design of the institution. If any meaning can be given to it at all, it must be made to operate exclusively upon -those who voluntarily or by expulsion leave the society. I think it cannot deprive such of their interest.
Those who entered into the. church relation, did so, no doubt, under a full conviction of duty, and-after coming to the conclusion, “once for all, to dedicate and devote themselves and all they possessed to the service of God forever,” according to their peculiar faith. It was absolutely necessary to provide for the support and comfort of the body while they were serving God spiritually. The formation of a joint stock, or interest, was adopted as the best plan to provide for the body, and -to place all the members in a situation best calculated to enjoy their religion. I cannot suppose that any one hypocritically became a member of the church relation* merely for the purpose of acquiring an interest in the joint estates and funds, and with a premeditated intention thereafter to abandon the society, and seek for a partition. Admitting all to be sincerely devoted to their religious creed, they signed the .covenant under the belief, that they would never renounce the faith professed, and that they would continue of choice, through life, to act up to its precepts. Under such convictions, they brought their property into the partnership ; or, what is the same thing, into the society. But an individual member changes his faith ; new views and opinions are embraced, and he now believes, that it is as inconsistent *200 -with tiie will of God to.continue in the society, as Fie formerly thought it was his duty. Under such a change, he abandons the society, and claims a share of the property. I think it ought to be decreed to him ; because,' as to him, all the purposes for which the partnership was entered into have ceased ; and because, it was .entered into for an indefinite period. His change of religion has as effectually disqualified him from pérforming the things, and submitting to the rules imposed by the Shaker faith,-as the infliction of lunacy would disqualify a member of an ordinary mercantile copartnership, from performing the duties imposed by the partnership contract. ,The chancellor should, therefore, put an end to both descriptions of partnership, under such circumstances, by dissolving them, as far as they related to the interests of the disqualified member, leaving the rights of-others untouched, and at liberty to proceed in their social capacity, if they choose to do so. Indeed, where general partnerships are formed for an unlimited time, any member, at his mere pleasure, may withdraw, and claim his share of the partnership effects. Watson, 379-80. The society of Shakers is nothing but a partnership, embracing the business of the lives of its members. The tie which binds them together, is their religious faith or belief, and I will briefly enquire into the effect ■which a change of faith or belief can, or ought, to have upon the temporal interests or property of its members.
It must be borne in mind, that the property of the Shakers is the production of their own industry and accumulations. If I give an estate to support and educate Shaker youths, or presbyterians, baptists, or methodists, I readily admit, that the recipients of my bounty, cannot, by any agreement among themselves, or by any thing they can do, place themselves in a condition in which they could demand a partition of the estates and funds proceeding from me. That is a very different case from one where the estates and funds are the product of the labor of the associates, and,which the chancellor is called on to divide among them. This last is the case of the Shakers. The question is, whether a *201 man, in their case, forfeits all interest, if he changes his opinions and faith, and leaves the society.
If such be the design of the covenant in regard to seceding members, it ought not to be enforced; because it is, to that extent, without consideration, and in violation of the policy and spirit of constitutional principles. Admit, for the.argument, that each member has agreed to forfeit his interest in the property, as soon as he forsakes the faith and the society — what consideration passes to him for that stipulation ? There is no consideration of blood, nor is there any of money or property. To put a case, suppose the member of a presbyterian church, enraptured with the doctrines of his spiritual teacher and pastor, were to execute a bond binding himself to convey all his property to the pastor, if he ever thereafter disbelieved the doctrine, or renounced his membership — could this contract be enforced upon the happening of the events which were to deprive the obligor of his estate ? Certainly not. Is the seceding shaker in a worse condition than the presbyterian ? The only way in which the conclusions resulting from the bare statement of the case can be avoided, is, to take a distinction between the case of an executory, and an executed contract. Let us test the case, then, by putting it in another form ; suppose the member of a presbyterian church conveys, by deed, all his property to A B, in trust, for the use of himself and family, so long as he' continues to belive the presbyterian creed, and remains a member of the church of which A B is pastor — what will become of the estate if the grantor abandons creed and church ? I do think that A B cannot thereby convert it into his individual estate, discharged of the interest of cestui que trusts. He held the legal title,-1 admit; but the trust, the use, was executed in behalf of the grantor and his family,, and their use cannot be divested in favor of a mere holder of the legal title, who has paid nothing. If the use is executed at all by the conveyance, it can no more be divested by the. idle stipulations relative to belief in a creed and continuance of church membership-, than if it had been an executory *202 contract, dependent for its fulfilment upon such consider rations and no other. I know, if an estate be conveyed uPon a condition which is impossible, or malum in sc, the estate is absolute, and the condition void. But the seccc|;ng shakers have made no such conveyance, and if there be estates held in trust for their use, and that use ever took effect, I am unwilling to forfeit their right of property or the use of it, upon the the idea, that they have agreed to the forfeiture, in case they changed their religion.
A man cannot prevent the change of his opinions. It is impossible to resist conviction and change of opinion, when new facts and new reasons are presented in such a manner as to give a new direction to the mind. Our own reflections may convince and turn us beyond the power of resistance. We may turn from the truth and embrace error ; but turn we must, when the mind is placed under the influence of new facts, new arguments, new circumstances and relations, altogether adverse to preconceived notions. We may regret the change of Our opinions ; the change may give us pain ; but we can no more resist the change by an effort of the will, than we can, by a similar effort, prevent the decay and dissolution of the body. An agreement, therefore, never to change an opinion, or to adhere, through all time, to this or that creed, is an idle undertaking to perform an impossibility. If the person, .so engaging should, in truth, perform and keep his promise, he could not do it in consequence of any obligation imposed by the covenant; but he would iieep the covenant only because new lights, no matter whether true or false, did not spring up to change the direction- of his mental vision, and sufficiently powerful to consume and supplant former ideas.
No man can sell his liberty and become a slave ; nor can any one sell his liberty of conscience, and make his temporal rights depend upon a creed and its observances. There are inalienable rights recognised by our Constitution, and liberty of conscience is one of them. “ No human authority ought in any case whatever to control, or interfere with, the rights of consciessce.” *203 Now if the Shaker is convinced that his faith and worship are erroneous, and therefore renounces both, and abandons tho church, is there any human authority to prevent it ? None. What is the effect of an agreement, that if a man changes his creed and abandons his church, he shall forfeit his property, acquired by years of toil, and give up the means of his subsistence ? Its direct tendency is, to bind down the conscience, and to suppress the “ free communication of thoughts and opinions,” tolerated by the constitution, as “ one of the invaluable rights of inau.” Who will speak out, when the publication of his opinions will cause him to be cast upqn the world in a state of pauperism ? I am therefore of opinion, that so much of the covenant in. question, as contemplates appropriating the property contributed to the joint stock by a seceder, and the proceeds of the labor of a seceding member of the Shaker society, to the "use — ef-Tliose who remain, is not only without any consideration, hut that it is a restraint upon-the rights of conscience, and in violation of the spirit and policy of the constitution, and therefore ought not-to be allowed.
In coming to the conclusions expressed, I do not pre*tend to say, that the faith of the Shakers and their religion are erroneous. As a judge, I have nothing to do-with creeds or their orthodoxy. I only intend to declare my opinion, that no man’s right to the enjoyment of property owned by him, and earned by his own labor, can be taken from him, in virtue of a contract which makes his adherence to this or that religious creed and practice a condition which, if violated, shall forfeit his right.
It is not necessary to state my views relative to the-proper mode of .making partition, because, under the-.opinion delivered, no partition can ever take place-